IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DEREK ALLEN,                                )
    Plaintiff,                          )
                                            )
v.                                          )        No. 3:10-1024
                                            )
CAROLYN W. COLVIN,                          )
    Acting Commissioner of Social Security,[1] )
    Defendant.                          )


To: The Honorable John T. Nixon, Senior District Judge


**REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for child's Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On February 13, 2007, the plaintiff filed applications for child's DIB and SSI, alleging a disability onset date of January 1, 2007.[2] (Tr. 9, 87-89, 97-100.) His applications were denied initially and upon reconsideration. (Tr. 53-56, 58-63.) A hearing was held before Administrative Law Judge ("ALJ") Claire R. Strong on January 8, 2010. (Tr. 24-48.) On January 27, 2010, the ALJ issued an unfavorable decision (tr. 9-19), and on September 1, 2010, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on May 26, 1987 (tr. 87), and he was 19 years old as of his amended alleged onset date. He is single, has a high school education, and has worked as a cashier. (Tr. 31, 37, 40.)

## A. Chronological Background: Procedural Development and Medical Records

From approximately December 2004 to January 2005, the plaintiff presented to Carrier Chiropractic for treatment of back and stomach pain. (Tr. 189-94.) On April 8, 2005, he presented to the Neurology Clinic at Vanderbilt University Medical Center ("Vanderbilt") with complaints of lumbar pain, which he indicated had started about six months earlier. (Tr. 208.) He did not have radiating pain, weakness, or numbness in his legs but reported that he could not walk farther than

---

[2] Because the plaintiff was younger than 22 years old as of his alleged onset date, he was entitled to apply for child's DIB benefits. *See* 20 C.F.R. § 404.350(a)(5).

twenty yards.  *Id.*  An MRI on April 13, 2005, revealed "[g]rade 1 spondylolisthesis of L5 on S1" and "[a]ssociated mildly bulging disc at 4-5 and 5-1."  (Tr. 207.)  The plaintiff followed up with Dr. Kenneth Gaines, a neurologist, on June 17, 2005, and he reported that his condition had not changed but that he had noticed "increased lower back pain" when bowling.  (Tr. 204.)  A physical examination revealed normal muscle strength, tone, and movement as well as normal sensation and reflexes.  (Tr. 206.)  Dr. Gaines diagnosed the plaintiff with congenital spondylolysis of the lumbosacral region and recommended that he lose weight and avoid contact sports and lifting weights over fifty pounds.  (Tr. 207.)  Dr. Gaines did not recommend surgery.  *Id.*

The plaintiff was also treated at the Vanderbilt Gastroenterology Clinic from August 2005 to August 2006.  (Tr. 199-204.)  In August 2005, he reported experiencing daily vomiting but said that he was not taking Nexium twice daily as recommended.[3]  (Tr. 202-03.)  He was placed on Carafate,[4] which reduced his vomiting to 2-3 times a week, but he continued to have occasional heartburn when he did not take Nexium for 24 hours.  (Tr. 203.)  He was diagnosed with obesity and "[r]efractory vomiting [related to] noncompliance" with medication.  (Tr. 204.)  He was advised to continue taking Nexium and Carafate and to exercise and "[i]mprove" his diet.  *Id.*  On July 5, 2006, he underwent an elective esophagogastroduodenoscopy ("EGD") that revealed a hiatal hernia.  (Tr. 200-01.)  He returned to the Gastroenterology Clinic on August 3, 2006, reporting that he had recently been binge drinking alcohol and was diagnosed with "[c]hemical gastritis . . . [related to] alcohol ingestion."  (Tr. 199-200.)

---

[3] Nexium is used to treat various gastroesophageal disorders.  Saunders Pharmaceutical Word Book 489 (2009) ("Saunders").

[4] Carafate is used to treat duodenal ulcers.  Saunders at 129.

On April 17, 2007, Robert Doran, M.A., a Tennessee Disability Determination Services ("DDS") consultative examiner, psychologically evaluated the plaintiff. (Tr. 213-16.) The plaintiff reported that he had been diagnosed with bipolar disorder approximately one year earlier by Dr. Norman Leeper.[5] (Tr. 213-14.) Mr. Doran reported that Dr. Leeper had prescribed Fluoxetine, Lamictal, and Adderall and that another physician prescribed Synthroid, Nexium, Sucralfate, Tramadol, and Meclizine.[6] (Tr. 214.)

The plaintiff reported that he had worked as a cashier at Sears and Walmart but was fired from Walmart "because he lifted something that was too heavy and hurt his back, ankles, and knees." *Id.* He also reported that he worked at a bowling alley for three months but quit in January 2007 after he "lifted some trash cans and threw his back out." *Id.* He related experiencing depression and said that he sometimes got mad, punched walls, and went "on a rampage." *Id.* He said that, since he started taking medication, he had not experienced a "rampage" in approximately one year. *Id.* He explained that he was unable to work because when "somebody will tell him to do something . . . [and] get on him because he didn't [do] it right[,] . . . he goes off on them, gets mad, and says things." *Id.* The plaintiff reported trying to harm himself while in middle school but said that he

---

[5] The plaintiff reported that he saw Dr. Leeper for psychiatric treatment and that he had done so for approximately one year. (Tr. 214.) He also reported that he had visited another psychiatrist approximately four years earlier but did not recall that psychiatrist's name. *Id. See also* n.9 *infra.*

[6] Fluoxetine is a selective serotonin reuptake inhibitor used to treat various mental health disorders including major depressive disorder, obsessive-compulsive disorder, bulimia, and panic disorder. Saunders at 299. Lamictal is used to treat bipolar disorder. *Id.* at 396. Adderall is used to treat attention deficit hyperactivity disorder ("ADHD"), narcolepsy, and obesity. *Id.* at 12. Synthroid is a synthetic thyroid hormone. *Id.* at 678. Sucralfate is a "cytoprotective agent for gastric ulcers." *Id.* at 666. Tramadol is an analgesic for moderate to severe pain. *Id.* at 715. Meclizine is used to treat vomiting, nausea, and motion sickness. *Id.* at 432.

had not attempted to do so since, and he denied having hallucinations and, according to Mr. Doran, he presented no evidence of psychosis. (Tr. 215.)

The plaintiff indicated that he took care of his personal hygiene, "emptie[d] the dishwasher," dusted "a little," took out the trash "if it [was] not too heavy," mowed the lawn using a riding lawnmower, took care of his pet lizard, watched television, and played video games. (Tr. 214.) He said that he did not cook, wash laundry, or shop for groceries. *Id.* He indicated that he had a driver's license but did not drive due to lack of money and added that his license was suspended because of an unpaid traffic ticket. *Id.*

Mr. Doran described the plaintiff's mood as "euthymic," his affect as "mood congruent," his insight as "fair," and his judgment and impulse control as "intact." (Tr. 214-15.) He opined that the plaintiff's intellectual functioning was average and that the plaintiff "did not exhibit symptoms of 'ADD'" and "did not describe symptoms meeting the criteria for a major depressive episode, or a manic, hypomanic, or a mixed episode," but he acknowledged that "[i]t could be that his medications are quite effective." (Tr. 215.) He assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 60-65,[7] and he diagnosed bipolar disorder, not otherwise specified ("NOS"), in partial remission, and ADHD, NOS, controlled by medication. *Id.* He opined that the plaintiff was moderately limited in his ability to adapt to changes and requirements and mildly limited in his

_____

[7] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.* A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

ability to understand and remember, sustain concentration and persistence, and interact with others. *Id.*

On April 18, 2007, Dr. Albert Gomez, a DDS consultative physician, physically examined the plaintiff. (Tr. 218-20.) Dr. Gomez observed that the plaintiff was obese and walked with a limp but was able to get "on and off the exam table without difficulty." (Tr. 219.) The plaintiff demonstrated moderate tenderness to palpation in his lumbar spine with full range of motion except for flexion at 60 degrees, but Dr. Gomez noted that "[i]t is possible that the [plaintiff] was not putting forth his best effort." (Tr. 220.) The plaintiff also had full range of motion in his shoulders, elbows, wrists, and ankles. (Tr. 219-20.) In his hips, he had full range of motion except for flexion at 110 degrees, which Dr. Gomez attributed to obesity, and he had full range of motion in his knees except for flexion at 120 degrees. *Id.* He had normal fine finger movement, normal finger extension, normal pinch grip, normal fist-making ability, and "good" hand grip bilaterally. *Id.* His motor strength was 5/5 in both upper and lower extremities, and he was able to perform straight leg raises in the sitting and lying positions. (Tr. 220.) He was also able to perform the tandem, heel, and toe walks and to perform the squat-and-stand maneuver on one leg. *Id.* Dr. Gomez diagnosed chronic low back pain, obesity, and chronic depression, and he opined that the plaintiff could occasionally lift 20-30 pounds and stand or sit at least six hours in an eight-hour workday with normal breaks. *Id.*

On May 17, 2007, Dr. Brad Williams, a nonexamining DDS consultant, completed a Psychiatric Review Technique ("PRT") (tr. 221-34), in which he found that the plaintiff had an affective disorder, NOS, but that it was not severe. (Tr. 221, 224.) He opined that the plaintiff had mild restrictions of the activities of daily living, no difficulties maintaining social functioning, and

no episodes of decompensation.[8]  (Tr. 231.)  Dr. Williams noted that, although the plaintiff reported that he was "bipolar," his medical records "reflect[ed] stability" and he was "not on medications." (Tr. 233.)

On May 29, 2007, Dr. Celia Gulbenk, a nonexamining DDS consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment.  (Tr. 235-42.)  Dr. Gulbenk opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday.  (Tr. 236.)  Dr. Gulbenk also opined that the plaintiff had an unlimited ability to push and/or pull, could frequently perform all postural activities, and had no manipulative, visual, communicative, or environmental limitations.  (Tr. 236-39.)

In August 2007, the plaintiff presented to Dr. John Bacon with pain in his back, knees, and stomach.  (Tr. 244-48.)  An MRI of his left knee revealed an "ovoid cyst anterior to the anterior horn lateral meniscus" with "no evidence of underlying meniscal tear" and "[n]o evidence of ligamentous tear."  (Tr. 246.)  The MRI also showed a "16mm probably benign cortical lesion proximal fibula." *Id.*

The plaintiff was treated at the Tennessee Heart and Vascular Institute in September 2007 for hypertension, headaches, and dizziness.  (Tr. 250-54.)  He was prescribed Atenolol and Enalapril for hypertension and advised to lose weight through diet and exercise.  (Tr. 252, 254.)  An echocardiogram on September 20, 2007, showed mild aortic sclerosis and "[m]ild mitral annular calcification" but normal systolic and diastolic function.  (Tr. 250.)

---

[8] Dr. Williams did not indicate the plaintiff's degree of difficulty maintaining concentration, persistence, or pace.  (Tr. 231.)

A CT scan of the plaintiff's head on October 1, 2007, showed "no acute intracranial process." (Tr. 260.) The CT scan showed a possible small cystic area; however, a brain MRI on October 10, 2007, showed no abnormality and was otherwise unremarkable. (Tr. 258, 260.) An MRI of his lumbar spine on October 10, 2007, revealed "[d]egenerative disc disease with anular disc bulging and shallow disc protrusions at the L3-4 and L4-5 levels." (Tr. 259.)

The plaintiff presented to Dr. Paulo Acosta on October 31, 2007, and November 19, 2007, with complaints of dizziness occurring "several times a day." (Tr. 262-64.) He reported experiencing lightheadedness, faintness, vertigo, sleepiness, and blurred vision and said that he had been diagnosed with sleep apnea in 2006 but that it had been left untreated. (Tr. 264.) A sleep study showed "[s]evere obstructive sleep apnea" (tr. 256-57), and Dr. Acosta diagnosed severe obstructive sleep apnea, dizziness/somnolence, fibromyalgia, temporomandibular joint syndrome, hypertension, and gastroesophageal reflux disease ("GERD"). (Tr. 262.) He recommended CPAP titration and weight loss to address the plaintiff's sleep apnea. *Id.*

Dr. Michael Schlosser, a neurologist, examined the plaintiff on December 3, 2007, for an evaluation of his low back pain. (Tr. 273-74.) The plaintiff had full strength in his lower extremities, his gait was within normal limits, and he did not have radiating pain, weakness, or numbness in his legs. (Tr. 273.) Dr. Schlosser reviewed the plaintiff's October 10, 2007, lumbar spine MRI and found degenerative disc disease at L3-L4 and L4-L5. *Id.* He observed that, although there was loss of disc height, disc dessication, and disc bulges causing effacement of the thecal sac, there was "no significant nerve root compressions or stenosis." *Id.* Dr. Schlosser advised the plaintiff to pursue physical therapy and prescribed a muscle relaxer but recommended against surgery. (Tr. 274.)

On December 5, 2007, the plaintiff returned to the Vanderbilt Gastroenterology Clinic, reporting that he had been "vomiting twenty times a day." (Tr. 276.) A physical exam was normal, with the exception of an "abnormal gait with guarding of [the left] knee," and a kidney, ureter, and bladder scan was unremarkable. (Tr. 276-77.) He was diagnosed with GERD, vomiting, obesity, constipation, generalized abdominal pain, and bipolar disorder. (Tr. 278.)

On December 11, 2007, the plaintiff presented to Dr. Norman Leeper at Volunteer Behavioral Health Care System with complaints of "intermittent difficulty with anxious and depressive symptoms."[9] (Tr. 282.) The plaintiff reported that his "physical problems . . . adversely affect[ed] his mood" and that "distress[] about his physical problems" led to a suicide attempt two months prior, but he denied current suicidal ideation. *Id.* He also reported that he was seeing a chiropractor and experiencing "positive benefit[s] from the visits." *Id.*

On December 12, 2007, Dr. Michael Ryan, a nonexamining DDS consultant, completed a physical RFC assessment in which he found limitations identical to those identified by Dr. Gulbenk. (Tr. 283-90.) On December 31, 2007, Dr. Jeffrey Bryant, Ph.D., a nonexamining DDS consultant, completed a PRT, finding that the plaintiff had affective disorder, NOS, and anxiety disorder, NOS, but that these impairments were not severe. (Tr. 291, 294, 296.) Dr. Bryant opined that the plaintiff experienced mild restrictions in the activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of

---

[9] Because the one page of Dr. Leeper's treatment note is identified as "Page 1 of 2," it appears that the record contains an incomplete version of this treatment note. (Tr. 282.) It also appears that the plaintiff previously sought treatment with Dr. Leeper because this treatment note references a "last contact date" of July 17, 2007. *Id. See also* n.5 *supra.* The record contains no other medical records from Dr. Leeper.

decompensation. (Tr. 301.) He also opined that the plaintiff was "generally stable with [treatment] and nonsevere from a mental standpoint." (Tr. 303.)

### B. Hearing Testimony

At the hearing, the plaintiff, a vocational expert ("VE"), and the plaintiff's mother, Debbie Allen, testified. (Tr. 24-48.) Although the ALJ explained to the plaintiff his right to representation and the plaintiff affirmed that he understood this right, he was not represented by either an attorney or nonattorney representative at the hearing. (Tr. 26-29.) Ms. Allen asked whether the plaintiff would be able to get an attorney after receiving an unfavorable decision, and the ALJ explained that the plaintiff could appeal an unfavorable decision or "reapply and start over." (Tr. 28.) After further elaboration by the ALJ, the plaintiff responded that he did not "really understand what [the ALJ was] saying," and Ms. Allen remarked that the plaintiff had "a problem understanding this stuff." *Id.* The ALJ told the plaintiff that she could not advise him and asked him whether he wanted to proceed with the hearing, to which the plaintiff replied, "I guess so." (Tr. 29.) The ALJ also informed the plaintiff that the record did not contain updated medical records after December 31, 2007, and that either a representative or the plaintiff himself could submit those records after the hearing. (Tr. 27.) The plaintiff and his mother told the ALJ that he did not have any medical records from 2008 or 2009 because he did not have insurance at that time. *Id.*

The plaintiff testified that he was 5'10" tall and weighed 275 pounds. (Tr. 30.) He said that he completed the 12th grade and last worked at a bowling alley in January 2007. (Tr. 37-38.) He explained that he injured his back at work and had difficulty standing for approximately one week

after the injury, but he also related that he "forgot to call in, and [the bowling alley] ended up letting [him] go over that." (Tr. 38.) He said that he had not applied for any jobs since. *Id.*

He reported that he experiences back pain every day and that, on a "good day," his pain is a 3-4 on a 10-point pain scale and he "can walk around somewhat without . . . a limp" but that, on a "bad day," his pain "can get up to about 9 [on the pain scale]" and he has "trouble getting around at all." (Tr. 34-35.) Although "most of the time" his left leg causes him to limp, the cause of his limp varies, and he needs to sit "somewhere soft" due to his back pain. (Tr. 32, 35.)

The plaintiff testified that Dr. Leeper treats him for bipolar disorder, anxiety, depression, and mood swings. (Tr. 32-33.) He related that he takes medications for bipolar disorder, anxiety, depression, reflux, thyroid disorder, and high blood pressure and that he does not experience any side effects from these medications. (Tr. 33-34.) He acknowledged that his medications help his conditions but said that he has "a tendency to forget to take them." (Tr. 34.)

The plaintiff reported that he does not "like getting out anymore" because he becomes "nervous around a lot of people." (Tr. 32.) He said that he occasionally visits relatives but that, more often, relatives visit him, and he said that he does not go to church or take vacations. *Id.* He said that he occasionally smokes cigarettes, drinks alcohol "[a] couple times a year," and does not use illegal drugs, although he admitted that he smoked marijuana in the past. (Tr. 32, 38.)

He testified that, on a typical day, he watches television and plays video games, and he related that he "used to love bowling" but cannot do it any longer. (Tr. 32, 35.) He said that, on occasion, he will go to the store for his dad or build a fire in the fireplace. (Tr. 35.) He testified that he does not cook but can prepare simple meals in the microwave or oven and occasionally goes grocery shopping but only buys a few items because he has "problems lifting a lot of it." (Tr. 36.)

He testified that he occasionally washes laundry and feeds his dog but does not wash dishes, make his bed, vacuum, mop, sweep, or dust.  (Tr. 36-37.)  He testified that he takes out the garbage "[i]f it's not too heavy" and that he mows the yard on a riding lawnmower.  (Tr. 37.)  He estimated that he could lift "no more than fifteen pounds," walk a quarter mile, and stand thirty minutes at a time.  (Tr. 42.)  He said that he could sit for "[l]ong periods of time" but that he would "occasionally need to get up and walk . . . to stretch out [the] muscles in [his] back."  *Id.*

Ms. Allen testified that the plaintiff "has a lot of trouble understanding things" and "has to have help with a lot of stuff."  (Tr. 46.)  She explained that "he does not choose to sit at home by himself" and that "[i]t's not a choice that . . . he doesn't get to interact with his friends or anything."  *Id.*  She said that he has bipolar disorder, back pain, knee pain, regurgitation, reflux, hiatal hernia, sleep apnea, and daily vomiting.  *Id.*

Jane Brenton, the VE, testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 39-40.)  She classified the plaintiff's past job as a cashier at Walmart as light and unskilled but explained that his job at the bowling alley "was performed for a very short period of time" and was not "relevant or gainful."  (Tr. 40.)  The VE testified that a hypothetical person with the plaintiff's age, education, and work experience who could lift up to fifty pounds occasionally and twenty-five pounds frequently would be able to perform the plaintiff's past relevant work.  *Id.*  Next, the VE testified that a hypothetical person with the plaintiff's age, education, and work experience would be able to perform the plaintiff's past relevant work if that person was able to lift 20-30 pounds occasionally and sit or stand at least six hours each in an eight-hour workday.  (Tr. 41.)  Finally, the VE testified that a hypothetical person with the plaintiff's age, education, and work experience would be unable to perform the plaintiff's past relevant work if that

person could occasionally and frequently lift fifteen pounds and could sit for long periods of time with a sit/stand option. (Tr. 42.) However, the VE testified that such a person could perform representative sedentary jobs such as information clerk, table assembler, and sorter. (Tr. 42-43.)

At the conclusion of the VE's testimony, the ALJ asked the plaintiff whether he understood the VE's testimony, and the plaintiff replied that he understood "[b]its and pieces." (Tr. 43.) After being offered the opportunity to question the VE, the plaintiff asked questions to clarify the record regarding the wages he earned at the bowling alley and his employment at Sears. (Tr. 44-45.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on January 27, 2010. (Tr. 9-19.) Based upon the record, the ALJ made the following findings:

1. Born on May 26, 1987, the claimant had not attained age 22 as of January 1, 2007, the alleged onset date of disability (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

\* \* \*

2. The claimant has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date of disability (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: hiatal hernia, gastro esophageal reflux disease, degenerative disc disease of lumbar spine with spondylosis and spondylolisthesis with lumbar bulging discs, sleep apnea, and cyst in left knee (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined

in 20 CFR 404.1567(b) and 416.967(b) which includes the ability to lift up to 20 to 30 pounds occasionally and lift/carry up to 10 pounds frequently; stand and/or walk for about 6 hours and sit for up to 6 hours in an 8 hour workday with normal breaks; have the option to sit or stand at will.

\* \* \*

6.    At all times relevant to this decision, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\* \* \*

7.    Born on May 26, 1987, the claimant was 19 years old on January 1, 2007, which is defined as a younger individual age 18-49 (20 CFR 404.1563 and 416.963).

8.    The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\* \* \*

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 11-19.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her

conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on

the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. § 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education, or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform.

*Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 416.920(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 11.) At step two, the ALJ determined that the plaintiff had the following severe impairments: hiatal hernia, GERD, degenerative disc disease of the lumbar spine with spondylosis and spondylolisthesis with lumbar bulging discs, sleep apnea, and a cyst in the left knee. (Tr. 12.) At step three, the ALJ found that the plaintiff's impairments, either singly or in

combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff was not capable of performing his past relevant work. (Tr. 17-18.) At step five, the ALJ determined that the plaintiff could perform unskilled, sedentary work as an information clerk, table assembler, and sorter. (Tr. 18-19.)

### C. The Plaintiff's Assertions of Error

The plaintiff makes several interrelated arguments. It appears that the plaintiff raises the following issues: (1) that the ALJ failed to fully develop the record; (2) that the ALJ failed to correctly evaluate the plaintiff's mental impairments under 20 C.F.R. §§ 404.1520a, 404.1545(c), 416.920a, and 416.945(c); (3) that the ALJ erred by determining that the plaintiff's impairments did not meet Listing 12.04C; (4) that the ALJ erred by failing to obtain the testimony of a medical expert on the issue of medical equivalency; (5) that the ALJ improperly assessed the medical opinion evidence; (6) that the ALJ failed to address the plaintiff's obesity; (7) that the ALJ failed to properly assess the plaintiff's subjective complaints; (8) that the ALJ erred by failing to consider all of the evidence; and (9) that the ALJ erred in formulating the plaintiff's RFC. Docket Entry No. 14-1, at 8-24.

### 1. The ALJ fully and fairly developed the record.

The plaintiff argues that the ALJ failed to fully develop the record. Docket Entry No. 14-1, at 8-10. Specifically, the plaintiff argues that, because he was not represented at the hearing by counsel, the ALJ had a special duty to ensure that the record was fully and fairly developed. *Id.*

In *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080 (2000), the United States Supreme Court found that "Social Security proceedings [] are inquisitorial rather than adversarial" and that the ALJ has the duty to "investigate the facts and develop the arguments both for and against granting benefits." *Id.* This language from *Sims* referenced the Court's explanation in *Richardson v. Perales*, 402 U.S. 389, 411, 91 S. Ct. 1420 (1971), that the ALJ was to remain nonpartisan and should not act as counsel for the Social Security Administration ("SSA"), but should "act[] as an examiner charged with developing the facts." *Id.* Although the Sixth Circuit in *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir. 1983), pointed out that there is no bright line test for determining when an ALJ fails to fully develop the record, it cited with approval decisions of other Circuits that interpreted what it described as the "*Perales* doctrine" and held that a special duty arises when the plaintiff is unrepresented and unfamiliar with hearing procedures. 708 F.2d at 1051-52.

It is well established in the Sixth Circuit that the plaintiff, and not the ALJ, has the burden to produce evidence in support of a disability claim. *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008) (citing 20 C.F.R. § 404.15129(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818, at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of [an] impairment."); *Landsaw v. Sec. of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and

(3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley*, 708 F.2d at 1051-52). In order to satisfy this special duty, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts . . . [and] be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (citations omitted).

The ALJ was not under a special heightened duty in this case. As the plaintiff points out, he appeared at the hearing without counsel and showed some unfamiliarity with hearing procedures. Docket Entry No. 14-1, at 9; (tr. 27-29, 43). However, in the Court's opinion, the plaintiff was fully capable of presenting an effective case, and, indeed, did so. The plaintiff points to transcript passages in which he expressed difficulty understanding whether he should proceed with the hearing or first obtain counsel (tr. 27-29) as well as his statement that he only understood "[b]its and pieces" of the VE's testimony. (Tr. 43.) Despite these moments of confusion, however, the record shows that the plaintiff was capable of presenting an effective case. The Court agrees with the defendant that the plaintiff had no difficulty answering the ALJ's questions and provided cogent testimony regarding background information (tr. 30-31, 37), his daily activities (tr. 31-32, 34-37), his alleged impairments and limitations (tr. 32, 34-37, 42), his medical treatment, medications, and side effects (tr. 32-34), and his work history. (Tr. 37-38.) Despite the plaintiff's professed confusion in following the VE's testimony, he understood enough to ask questions and to correct an error in his job history. (Tr. 44-45.) Additionally, the plaintiff's mother testified and provided information and clarification on his behalf. (Tr. 27-28, 46-47.)

Moreover, in his supporting brief, the plaintiff does not allege any errors by the ALJ during the hearing itself. Docket Entry No 14-1, at 8-10. Indeed, even if the ALJ was acting under a special

duty to conscientiously probe into, inquire of, and explore relevant facts, she clearly did so in this case. The ALJ explained to the plaintiff his right to representation and various hearing procedures (tr. 26-29) and questioned the plaintiff in detail regarding his background, work history, daily activities, physical and mental impairments, current medical treatment, medications, and side effects. (Tr. 30-38.) The ALJ even posed a hypothetical question to the VE based on the plaintiff's own estimation of his limitations. (Tr. 42-43.)

The plaintiff's primary argument is that the ALJ should have requested medical source statements from a number of medical sources, including Dr. Leeper, Dr. Wyatt, Dr. Acosta, Dr. Schlosser, Dr. Bacon, and "the health department." Docket Entry No. 14-1, at 8-9. The plaintiff does not provide any support for his contention that the ALJ was required to obtain medical source statements from these doctors, and the Court is not persuaded that the ALJ was under any such duty. First, as noted above, the ALJ was not acting under a special heightened duty to develop the record. Consequently, it remained the plaintiff's burden to produce evidence in support of his disability claim. *See Wilson*, 280 Fed. Appx. at 459. Second, the record contains treatment notes from each of these medical sources, which the ALJ reviewed in making her decision, as well as a wealth of other medical evidence sufficient for the ALJ to reach her decision. The ALJ examined in detail medical records containing the plaintiff's reports of his symptoms, clinical findings after examinations, radiographic results, diagnoses, and prescribed treatment. (Tr. 13-17.) The record also contains consultative psychological and medical examinations, including the opinions of the consultative examiners, as well as the opinions of the nonexamining DDS consultants who reviewed the plaintiff's medical records. (Tr. 213-16, 218-42, 283-304.) There was sufficient evidence in the record for the ALJ to reach a decision, and the ALJ developed the record to the extent required.

To the extent that the plaintiff argues that the ALJ should have obtained updated medical records (Docket Entry No. 14-1, at 8-9), the Court notes that both the plaintiff and his mother affirmatively told the ALJ that he had no medical records from 2008 or 2009 because he did not have insurance to pay for medical care during this time period.[10] (Tr. 27.) Significantly, although the plaintiff is currently represented by an attorney, he has not produced records from this time period or shown how they would affect the substantive issues in this case. Under these circumstances, the Court cannot say that the ALJ should have obtained additional medical records.

Finally, an issue developed in this case based on the defendant's motion to substitute the administrative record to include four pages of medical evidence that appeared as blank pages in the originally filed administrative record. Docket Entry No. 17. These four pages concern the plaintiff's treatment at the Vanderbilt Gastroenterology Clinic on December 5, 2007, as well as a referral letter from an ophthalmology consult dated October 30, 2007.[11] (Tr. 276-79.) The defendant asserts that the four pages were included in the record that was submitted to the ALJ but were mistakenly omitted when electronically transferring the record to this Court. Docket Entry No. 21-1, at 3. The plaintiff, while not objecting to the defendant's motion to substitute the record, argues that "[t]here is no evidence that the ALJ considered the missing medical records." Docket Entry No. 19, at 3. This statement is demonstrably false. In her decision, the ALJ specifically discussed the plaintiff's visit to the Gastroenterology Clinic on December 5, 2007. (Tr. 15.) The plaintiff also argues that

---

[10] Although the plaintiff and his mother made those representations, the plaintiff also testified that he was currently seeing Dr. Leeper and his mother interjected that he had seen Dr. Leeper every three months. (Tr. 32-33.)

[11] In the letter, Dr. Sean Donahue, an ophthalmologist, opined that the plaintiff's double vision was not organic, was likely the result of blurry or dry eyes, and was not related to his vomiting or dizziness. (Tr. 279.)

"there is no evidence that these missing medical records were viewed by the state agency medical consultants." Docket Entry No. 19, at 4. This statement is also demonstrably false. The record shows that DDS medical consultant Dr. Ryan reviewed this evidence when forming his opinion on the plaintiff's RFC. (Tr. 290.) These records were plainly before the ALJ when reaching her decision.[12]

### 2. The ALJ properly evaluated the plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a, 404.1545(c), 416.920a, and 416.945(c).

The plaintiff argues that the ALJ erred by "failing to correctly evaluate [his] mental conditions in accordance with 20 C.F.R. §§ 404.1520a, 404.1545(c), 416.920a and 416.945(c)." Docket Entry No. 14-1, at 22.

The Regulations provide that, when the Social Security Administration ("SSA") evaluates a plaintiff's mental abilities, it will:

> first assess the nature and extent of [the plaintiff's] mental limitations and restrictions and then determine [the plaintiff's] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [the plaintiff's] ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(c). When assessing the severity of the plaintiff's mental impairments, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. §§ 404.1520a and 416.920a. First, the ALJ is required to

---

[12] The originally filed administrative record (Docket Entry No. 10) not only excluded the four pages at issue but also included duplicates of most of the pages. Docket Entry No. 20 is now the correct administrative record.

evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[13] 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). These four functional limitations are known as the paragraph "B" criteria. The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Regulations require the ALJ to attach a point value to each of the four functional areas. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). For the first three categories, the Regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four-point scale: none, one or two, three, and four or more. *Id.* "If the ALJ rates the first three functional areas as

---

[13] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 416.920a(e).

'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). If the impairment is severe, then the ALJ "will then determine if it meets or is equivalent in severity to a listed mental impairment," and, if it does not, then the ALJ will move on to assess the plaintiff's RFC. 20 C.F.R. §§ 404.1520a(d)(2)-(3), 416.920a(d)(2)-(3).

The ALJ is also required to document the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).[14] 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

The ALJ correctly applied the special technique in this case. First, the ALJ found that the plaintiff had the medically determinable impairment of bipolar disorder. (Tr. 12.) The ALJ then evaluated the paragraph "B" criteria by assessing the plaintiff with mild restrictions of activities of daily living, mild difficulties in social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* The plaintiff does not contest the ALJ's findings regarding the paragraph "B" criteria with any specificity. Docket Entry No. 14-1, at 22-24. Because the ALJ rated the plaintiff's limitations in the first three functional areas as "mild" and his limitation in the fourth functional area as "none," the ALJ appropriately found that the

---

[14] Since 2000, the ALJ is no longer required to complete a Psychiatric Review Technique form. *Rabbers*, 582 F.3d at 653-54. The Regulations only require that an ALJ's written decision "incorporate the pertinent findings and conclusions based on the [special] technique." *Id.*

plaintiff's bipolar disorder was not a severe impairment. (Tr. 12.) Consequently, the ALJ was not required to further address whether the plaintiff's impairment met or equaled a listed impairment. 20 C.F.R. §§ 404.1520a(d)(1)-(3), 416.920a(d)(1)-(3). *See also Rabbers,* 582 F.3d at 653.

The ALJ went on to consider the plaintiff's mental impairments when determining his RFC. In doing so, the ALJ determined that the plaintiff's alleged mental impairments were no more than mildly limiting:

> [The plaintiff] gave a self-report of bipolar disorder. However, the medical records to [*sic*] not provide a basis for a definitive diagnosis with regard to bipolar disorder. Description of symptoms did not meet the criteria for a bipolar disorder and there were no symptoms with regard to attention deficit disorder. There were intermittent episodes of anxiety and depression mostly with regard to physical symptoms that affected his mood. [The plaintiff] performed routine daily activities independently as noted by Dr. Leeper and Dr. Doran[15] and was able to relate adequately with people. Adaptive functioning was consistent with mild symptoms or some difficulty in social or occupational functioning but generally functioning pretty well. . . . It is determined that any mental disorder results in only mild limitations and, therefore, is "non-severe."
> . . . .
> The evidence in the record does not provide a basis for significant limitations with regard to mental issues. Difficulties and/or symptoms were manageable and responsive to medications or other forms of treatment.

(Tr. 16.)

The plaintiff argues that the ALJ should have accepted a diagnosis of bipolar disorder by Dr. Acosta as well as diagnoses of bipolar disorder and ADHD by Dr. Leeper. Docket Entry No. 14-1, at 24. The Court notes initially that Dr. Acosta treated the plaintiff for sleep apnea and, although his treatment notes reference bipolar disorder, the references come in the portion of the notes related to historical information, not diagnoses. (Tr. 262, 264.) Additionally, only a portion

---

[15] As the plaintiff points out, the ALJ incorrectly identified Mr. Doran as "Dr. Doran." Docket Entry No. 14-1, at 14; (tr. 16-17).

of a single treatment note from Dr. Leeper is contained in the record and that note merely addresses treatment for ADHD and "affective symptoms." (Tr. 282.) However, even if the ALJ accepted this evidence as constituting diagnoses of ADHD and bipolar disorder, the diagnoses themselves say nothing regarding the plaintiff's functional limitations in the workplace. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (noting that a "mere diagnosis. . . says nothing about the severity of the condition."). As addressed in more detail below, the ALJ clearly considered the medical evidence from both Drs. Acosta and Leeper, as she was required to do, but concluded that the medical records did not provide a basis for a definitive diagnosis of bipolar disorder or document symptoms of ADHD. (Tr. 16.) The plaintiff has not demonstrated that the ALJ erred in reaching this conclusion.

The ALJ appropriately considered all of the evidence regarding the plaintiff's alleged mental impairments and complied with 20 C.F.R. §§ 404.1520a and 416.920a by assessing the "B" criteria and giving specific ratings for each of the four functional limitation categories. (Tr. 12.) Likewise, after assessing the plaintiff's mental limitations, the ALJ properly evaluated his mental RFC as required by 20 C.F.R. §§ 404.1545(c) and 416.945(c), ultimately determining that the inclusion of mental limitations in the RFC was not warranted. (Tr. 13-17.) The ALJ made specific findings in support of her decision, and these findings are supported by substantial evidence in the record.

### 3. The plaintiff does not meet Listing 12.04C.

The plaintiff argues that he meets the criteria of Listing 12.04C for affective disorders and that he is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 14-1, at 10-12. The ALJ found that the plaintiff's bipolar disorder was not a

severe impairment, and, although the ALJ did not specifically analyze the plaintiff's mental impairments under Listing 12.04C, she generally found that none of his impairments met or equaled a listed impairment. (Tr. 12.)

The plaintiff has the burden of proof at step three to demonstrate that "he has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990). If the plaintiff demonstrates that his impairment meets or equals a listed impairment, the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

The plaintiff argues that his mental impairments meet the requirements of the second paragraph of Listing 12.04C. Docket Entry No. 14-1, at 10-12. In order to satisfy the requirements of Listing 12.04C, the plaintiff must demonstrate:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> . . . .
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C.

As noted above, the ALJ did not specifically address whether the plaintiff met Listing 12.04C, nor was she required to do so because she had already determined that his bipolar disorder was not a severe impairment. *See* 20 C.F.R. §§ 404.1520a(d)(1)-(3), 416.920a(d)(1)-(3). *See also Rabbers,* 582 F.3d at 653. The plaintiff has not demonstrated that the ALJ erred in making this finding; therefore, it is not necessary for the Court to determine whether the plaintiff meets Listing 12.04C. Nevertheless, the Court will address the plaintiff's argument.

The plaintiff has not shown that he meets the diagnostic requirement of Listing 12.04C because he has not shown that bipolar disorder causes more than a minimal limitation of his ability to do basic work activities. Indeed, as the ALJ noted, the plaintiff has demonstrated no more than minimal limitations due to his mental impairment. (Tr. 12, 16.)

The plaintiff reported that he is able to perform personal care and household chores with some physical limitations and can also drive, shop, and handle money. (Tr. 31, 35-36, 102-04, 109, 123-24, 140-43.) His mother reported that he is able to take care of his personal needs with some reminders and that he prepares simple meals and, with some physical limitations, performs household chores and goes shopping. (Tr. 130-32.) At the hearing, the plaintiff testified that his daily activities include watching television, playing video games, going to the store, and helping with household chores. (Tr. 31-32, 35-37.) However, he never alleged any restrictions in these activities due to mental limitations. The plaintiff reported that he has problems with supervisors, co-workers, and anxiety, and he testified at the hearing that he does not like going out, gets nervous around groups of people, and has mood swings and anger issues when he stops taking his medication. (Tr. 32, 34, 164.) However, the plaintiff also reported that he engages in social activities with friends

as often as 4-5 days per week and that he does not have any problems getting along with others, including authority figures. (Tr. 105-07, 109-10, 140, 144, 146.)

The DDS psychological consultants also opined that the plaintiff had generally mild symptoms.[16] Mr. Doran opined that the plaintiff had mild limitations in the areas of understanding and remembering, sustained concentration and persistence, and interaction with others, as well as moderate limitations adapting to changes and requirements. (Tr. 215.) Dr. Bryant found mild limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 301.) Dr. Williams found only a mild limitation in the activities of daily living. (Tr. 231.)

This evidence falls short of showing that bipolar disorder causes the plaintiff more than minimal limitations in his ability to perform work functions. Consequently, the plaintiff has failed to show that he meets Listing 12.04C, and the ALJ's decision that the plaintiff does not meet the criteria of any listed impairment is supported by substantial evidence.

**4. The ALJ was not required to obtain the testimony of a medical expert to determine medical equivalency.**

The plaintiff argues that the ALJ should have obtained "testimony from a medical expert to determine if the [plaintiff] equals [Listing 12.04C]." Docket Entry No. 14-1, at 12. In support of his argument, the plaintiff cites Social Security Ruling ("SSR") 96-6p, which provides that, while the ALJ is "responsible for deciding the ultimate legal question whether a listing is met or equaled," "longstanding policy requires that the judgment of a physician (or psychologist) designated by the

_____

[16] The record does not contain an opinion by a treating source regarding the plaintiff's mental limitations.

Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3. The Ruling goes on to list certain acceptable forms for an expert opinion by a State authorized physician or psychologist on the issue of equivalency, including Disability Determination and Transmittal forms and PRT forms. Here, the record contains Disability Determination and Transmittal forms completed by Dr. Gulbenk and Dr. Ryan at both the initial and reconsideration levels of administrative review (tr. 49-52) as well as PRT forms completed by DDS psychological examiners Drs. Bryant and Williams, who opined both that the plaintiff did not meet or equal Listing 12.04C. (Tr. 221, 232-33, 291, 302-03.) Contrary to the plaintiff's assertion, the ALJ relied on the opinions of medical experts in reaching her decision, and these medical opinions satisfy the requirements of SSR 96-6p.

The plaintiff also argues that a medical expert should have been present at the hearing (Docket Entry No. 14-1, at 12), but he has not cited any authority for this proposition. To the extent that the plaintiff is arguing that the ALJ should have obtained an updated medical expert opinion, SSR 96-6p only requires an updated medical expert opinion when either "(1) there is evidence of symptoms, signs and findings that suggest to the ALJ . . . that the [plaintiff's] condition may be equivalent to the listings; or (2) when additional medical evidence is received that 'in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding' that the impairment does not equal the listings." *Kelley v. Comm'r of Soc. Sec.*, 314 Fed. Appx. 827, 830 (6th Cir. Feb. 2, 2009). *See also Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 723 (6th Cir. May 7, 2012).

Neither condition is met in this case. First, as discussed above, the ALJ found that the plaintiff's mental impairments were not severe, a finding which reveals the ALJ's belief that the

plaintiff's impairments fall well short of listing-level severity. The ALJ's conclusion is supported by the PRTs from Drs. Bryant and Williams, who opined that the plaintiff did not meet or equal Listing 12.04C. (Tr. 221, 232-33, 291, 302-03.) Second, the record contains no additional medical evidence regarding the plaintiff's mental impairment after Dr. Bryant reviewed the record. Therefore, there was no additional medical evidence before the ALJ that could have changed Dr. Bryant's conclusion that the plaintiff did not meet the listing. The ALJ did not err by not obtaining additional medical expert opinion evidence.

### 5. The ALJ properly assessed the medical opinion evidence.

The plaintiff argues that the ALJ erred by not giving controlling weight to the opinions of Drs. Leeper, Schlosser, and Acosta and by giving too much weight to the opinions of the DDS consultative physicians. Docket Entry No. 14-1, at 17-19. According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). The medical opinion of a treating source[17] is entitled to "controlling weight" if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[18]

---

[17] The Regulations define a treating source as "[the plaintiff's] own physician, psychologist, or other acceptable medical source who provides [the plaintiff], or has provided [the plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the plaintiff] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the plaintiff's] medical condition(s)." *Id.*

[18] Effective March 26, 2012, the numbering for the treating physician rule changed, and sections 404.1527(d)(2) and 416.927(d)(2) became sections 404.1527(c)(2) and 416.927(c)(2), respectively. *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir.

*See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If the ALJ does not give a treating source's medical opinion controlling weight, he must weigh the opinion using the factors in 20 C.F.R. § 416.927(c)(2)-(6)[19] and provide "good reasons" for the weight given to the treating source's opinion. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. § 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[20] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

The plaintiff argues that Dr. Leeper is a treating physician and that his diagnoses of bipolar disorder and ADHD should be given controlling weight. Docket Entry No. 14-1, at 17-18.

---

Sept. 14, 2012).

[19] Appropriate factors include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. § 416.927(c)(2)-(6).

[20] The rationale for the "good reasons" requirement is to provide the plaintiff with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

However, the plaintiff misconstrues the evidence from Dr. Leeper. First, only a portion of a single treatment note from Dr. Leeper, dated December 11, 2007, is included in the record. (Tr. 282.) The ALJ addressed this treatment note, observing that it contained diagnoses of ADHD and "affective symptoms" (tr. 15), but it is difficult to determine the extent of the treatment relationship from a single treatment note. The plaintiff contends that Dr. Leeper diagnosed him with bipolar disorder as early as 2006 and cites to his own self-reports to this effect during consultative examinations. Docket Entry No. 14-1, at 18; (tr. 213-14, 262, 264, 282). However, even assuming that Dr. Leeper is a treating source and that he diagnosed the plaintiff with bipolar disorder in 2006, such a diagnosis says nothing regarding the plaintiff's functional limitations. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental restrictions."). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (finding that a "mere diagnosis. . . says nothing about the severity of the condition"). The record does not contain any medical opinion from Dr. Leeper concerning the plaintiff's functional limitations, and the Court must conclude that the ALJ gave Dr. Leeper's treatment note all of the consideration that was required.

The plaintiff also argues that the ALJ should have given controlling weight to the opinion of Dr. Schlosser, who indicated that the plaintiff's low back pain was due to degenerative disc disease. Docket Entry No. 14-1, at 14, 16, 18; (tr. 273-74). Dr. Schlosser, however, is not a treating source because he only performed a single consultative examination. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (finding that a single examination of a patient by a doctor

does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (finding that a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502).  Consequently, the treating physician rule does not apply, and the ALJ was only required to consider the evidence from Dr. Schlosser in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c).  The ALJ thoroughly considered Dr. Schlosser's findings, noting that during the physical examination, the plaintiff had full strength in his lower extremities and his gait was within normal limits.  (Tr. 15, 273.)  The ALJ also noted Dr. Schlosser's review of the plaintiff's lumbar MRI showing "degenerative disc disease at L3-4 and L4-5 with disc bulges but no significant nerve root compressions or stenosis" as well as Dr. Schlosser's recommendation against surgical intervention.  *Id.*  The ALJ also noted that physical examinations were generally within normal limits (tr. 16, 205-07, 210-11, 219-20, 271, 273) and that the plaintiff had been treated conservatively.  (Tr. 16, 207, 274.)  Indeed, the ALJ incorporated Dr. Schlosser's findings to the extent that she included degenerative disc disease as one of the plaintiff's severe impairments, and, although Dr. Schlosser did not offer an opinion regarding specific functional limitations, the ALJ included physical limitations in the plaintiff's RFC due to his back condition. (Tr. 12.)  The ALJ appropriately considered and incorporated the evidence from Dr. Schlosser.

The plaintiff also argues that the ALJ should have given controlling weight to the opinion of Dr. Acosta.  Docket Entry No. 14-1, at 14, 16-18.  Dr. Acosta, whom the plaintiff visited on only two occasions for complaints of dizziness, is also not a treating source.  (Tr. 262-64.)  The plaintiff points to Dr. Acosta's "diagnosis" of bipolar disorder.  Docket Entry No. 14-1, at 17-18.  However,

as noted above, Dr. Acosta merely listed bipolar disorder when recording the plaintiff's medical history but never treated the plaintiff for bipolar disorder. (Tr. 262, 264.) Dr. Acosta did diagnose the plaintiff with severe obstructive sleep apnea, although he did not offer any opinion regarding the plaintiff's functional limitations, and the ALJ included sleep apnea as one of the plaintiff's severe impairments. (Tr. 12.) The ALJ appropriately considered Dr. Acosta's opinion.

The plaintiff also argues that the ALJ improperly gave controlling weight to the opinions of the nonexamining and examining DDS medical consultants. Docket Entry No. 14-1, at 14-15, 18. The ALJ gave "significant weight" to the opinions of Dr. Gomez, who physically examined the plaintiff and opined that he could lift 20-30 pounds occasionally and stand or sit at least six hours in an eight-hour workday with normal breaks, and Mr. Doran, who psychologically examined the plaintiff and opined that he had mild limitations in his ability to understand and remember, sustain concentration and persistence, and interact with others, with moderate limitations in his ability to adapt. (Tr. 17, 213-16, 218-20.) The ALJ also gave "significant weight" to the opinions of the nonexamining DDS medical consultants, Drs. Gulbenk and Ryan, who opined that the plaintiff could perform work at the medium-exertional level, and the opinions of the nonexamining DDS psychological consultants, Drs. Williams and Bryant, who opined that the plaintiff had only mild mental limitations. (Tr. 17, 221-42, 283-304.)

The plaintiff argues that "opinions from sources other than treating sources can never be entitled to 'controlling weight.'" Docket Entry No. 14-1, at 14. However, the ALJ did not give these opinions controlling weight and did not adopt any of these opinions entirely as the plaintiff's RFC. Rather, the ALJ considered each opinion as she was required to do and explained the weight that she

gave each opinion in formulating the plaintiff's RFC. The ALJ did not err in assessing the medical opinion evidence.

**6. The ALJ did not err by failing to address the plaintiff's obesity and its effect on his ability to work.**

The plaintiff contends that the ALJ did not properly consider his obesity when determining his RFC. Docket Entry No. 14-1, at 19-20.

SSR 02-01p, which details the SSA's policy on obesity, provides that, even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's RFC. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1. Accordingly, SSR 02-01p provides that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

The Sixth Circuit has held that SSR 02-01p does not offer "any particular procedural mode of analysis for obese disability claimants." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. Jan. 31, 2006)). Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* (quoting *Bledsoe*, 165 Fed. Appx. at 412). However, obesity should be evaluated on a case by case basis because it "*may or may not* increase

the severity or functional limitations of the other impairment." Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *6 (emphasis added). An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of his obesity. *See Coldiron*, 391 Fed. Appx. at 443. The Sixth Circuit has also held that an "ALJ does not need to make specific mention of obesity if [s]he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed. Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The plaintiff testified that he was 5'10" tall and weighed 275 pounds. (Tr. 30.) The record contains descriptions of his weight and diagnoses of obesity as well as recommendations by his doctors that he lose weight. (Tr. 204, 207, 219, 251, 253, 262, 264-65.) Dr. Gomez diagnosed the plaintiff as obese and attributed a decreased range of motion in his hips to obesity. (Tr. 219.) The plaintiff argues that the ALJ erred by not addressing his obesity and that the ALJ should have considered whether he had any functional limitations due to obesity. Docket Entry No. 14-1, at 19-20.

Initially, the Court observes that the ALJ addressed much of the evidence related to the plaintiff's obesity, noting the plaintiff's height and weight as measured by Dr. Gomez[21] as well as the recommendations of other doctors that he lose weight. (Tr. 13-14, 16.) Moreover, the ALJ gave significant weight to the opinion of Dr. Gomez, whose assessment of the plaintiff's functional abilities included consideration of his obesity. (Tr. 17, 220.) Because the ALJ credited Dr. Gomez's opinion and incorporated his opinions regarding the plaintiff's limitations into the plaintiff's RFC, it was not necessary for the ALJ to address the plaintiff's obesity in any greater detail. *See Bledsoe*, 165 Fed. Appx. at 12. Moreover, it is the plaintiff's burden to prove the extent of his functional

---

[21] Dr. Gomez found the plaintiff to be 5'9" tall and weigh 260 pounds. (Tr. 219.)

limitations resulting from obesity. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Although there are some diagnoses of obesity in the record, there is very little evidence concerning functional limitations resulting from obesity. Indeed, even in his supporting memorandum, the plaintiff does not suggest any specific limitations that result from obesity. Docket Entry No. 14-1, at 19-20. A diagnosis of obesity, without more, does not render obesity a severe impairment. The plaintiff was required to demonstrate the degree of functional loss resulting from obesity, and he has failed to do so. The ALJ properly considered the medical evidence of record, including the plaintiff's testimony and the reports of his treating and consulting physicians, and appropriately determined that obesity did not result in any functional limitations.

**7. The ALJ properly evaluated the plaintiff's subjective complaints.**

The plaintiff argues that the ALJ erred in evaluating the credibility of his subjective complaints. Docket Entry No. 14-1, at 20-22. The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff's] complaints as incredible, [she] must clearly state [her] reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F. 3d 1027, 1036 (6th Cir. 1994)).

SSR 96-7p emphasizes that credibility determinations must find support in the record and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In

assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain her credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529, 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[22] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). The SSA also provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).[23] The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence,

---

[22] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

[23] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side

or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).

The ALJ satisfied the first prong of the *Duncan* test when she found that the plaintiff's medically determinable impairments could reasonably be expected to produce some of his alleged symptoms. (Tr. 17.) However, for a number of reasons, the ALJ found that the plaintiff's complaints were not credible to the extent alleged. *Id.* Contrary to the plaintiff's assertion that the ALJ "merely decided that [he] was not credible and disregarded all his years of documented symptoms" (Docket Entry No. 14-1, at 22), the ALJ in fact discussed the plaintiff's credibility in significant detail.

The ALJ relied upon the plaintiff's medical records and testimony in making her credibility assessment and articulated several reasons supporting her decision. First, the ALJ noted the lack of objective medical evidence supporting the alleged intensity, severity, and frequency of the plaintiff's symptoms. (Tr. 16-17.) For example, regarding the plaintiff's back pain, the ALJ noted that, although the medical evidence established "congenital lumbar degenerative disc disease with spondylolysis/spondylolisthesis at L3-4, L4-5, and L5-S1[,]...[t]hese were rated as minor, Grade 1." (Tr. 16, 207.) The ALJ also noted that the plaintiff's bulging discs were "mild and shallow" and that MRI scans showed "no significant nerve root compressions or stenosis." (Tr. 16-17, 207, 259, 269, 273.) The ALJ also observed that physical examinations were generally within normal limits.

---

effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other facts concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

(Tr. 16-17, 205-07, 210-11, 219-20, 271, 273.) Similarly, regarding the plaintiff's alleged mental impairments, the ALJ found that the plaintiff had demonstrated only mild symptoms. (Tr. 16-17.)

The ALJ also addressed the plaintiff's daily activities, noting the plaintiff's reports to Dr. Doran that he "performed some household chores consisting of emptying the dishwasher, dusting, taking out the trash, mowing the yard with a riding mower, caring for his pet lizard, and driving as needed." (Tr. 13, 214.) The ALJ also noted the plaintiff's testimony to similar effect, including that he also "occasionally [went] to the store, occasionally [took] out the trash, occasionally [fed] the dog," and liked to play video games. (Tr. 15.) The ALJ concluded that the plaintiff's "presentation and level of independent functioning" did not support the severity of the alleged symptoms. (Tr. 17.)

The ALJ also considered the plaintiff's medications and side effect, finding that the record did not show the presence of any side effects and that the plaintiff "received a good result from medications when taken as prescribed on a consistent basis." (Tr. 17.) Regarding the plaintiff's mental impairments, the ALJ concluded that "[d]ifficulties and/or symptoms were manageable and responsive to medications or other forms of treatment." *Id.*

Throughout her decision, the ALJ explained her reasoning for finding that the plaintiff's subjective complaints were not credible and addressed several of the factors outlined in 20 C.F.R. § 404.1529(c)(3). The Court concludes that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations were not fully credible. The ALJ's decision demonstrates that she complied with the *Duncan* test and 20 C.F.R. § 404.1529 in evaluating the plaintiff's subjective complaints.

43

**8. The ALJ properly considered the medical evidence of record.**

The plaintiff argues that the ALJ erred by failing to consider all of the evidence. Docket Entry No. 14-1, at 16-17. Specifically, the plaintiff argues that the ALJ "failed to consider, or chose to ignore" the opinions of Drs. Schlosser and Acosta. *Id.* at 16. However, as addressed above, the ALJ specifically addressed the medical evidence from both doctors and incorporated their findings when assessing the plaintiff's severe impairments. Neither doctor offered an opinion regarding the plaintiff's functional limitations.

Elsewhere in his memorandum, the plaintiff argues that the ALJ "failed to consider, or chose to ignore" his allegation in a disability report "that he has problems grabbing objects due to limited movement in his right thumb." Docket Entry No. 14-1, at 15; (tr. 160). The ALJ is not required to discuss every piece of evidence in the record, "and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Moreover, the record is devoid of further evidence concerning this complaint. The plaintiff did not report having problems with his thumb to his doctors, nor did he address it in his testimony. During a physical examination, Dr. Gomez found that the plaintiff had normal fine finger movement, normal finger extension, normal pinch grip, normal fist-making ability, and "good" hand grip bilaterally. (Tr. 219-20.) A medically determinable impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the plaintiff's] statement of symptoms." 20 C.F.R. § 404.1508. The ALJ did not err by failing to address the plaintiff's isolated complaint of limitation of movement in his right thumb.

### 9. The ALJ did not err in formulating the plaintiff's RFC.

The plaintiff argues that the ALJ erred in determining his RFC and raises several arguments in support of his contention. Docket Entry No. 14-1, at 12-16. The ALJ determined that the plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) which includes the ability to lift up to 20 to 30 pounds occasionally and lift/carry up to 10 pounds frequently; stand and/or walk for about 6 hours and sit for up to 6 hours in an 8 hour workday with normal breaks; [and] have the option to sit or stand at will." (Tr. 13.)

First, the plaintiff argues that the ALJ erred when she concluded that he could perform light work because the Regulations define light work as involving "lifting no more than 20 pounds at a time." 20 C.F.R. §§ 404.1567(b) and 416.967(b). The Court agrees with the plaintiff that the ALJ's formulation of his RFC is somewhat unclear because it appears to define light work differently than the Regulations. However, the Court also agrees with the defendant that the ALJ simply determined that the plaintiff can perform light work as defined in the Regulations with modifications for his ability to lift 20-30 pounds occasionally and his need for a sit/stand option. Docket Entry No. 15, at 14. This RFC appears to combine Dr. Gomez's opinion with the plaintiff's testimony that he cannot sit for long periods of time and occasionally needs to get up and walk to stretch out his back muscles. An RFC is a measurement of the most the plaintiff can do despite his limitations. 20 C.F.R. 404.1545(a). The ALJ was not absolutely limited to categories such as "light work" or "sedentary work" and was permitted to set the plaintiff's RFC as warranted by the evidence in the record. The plaintiff has not shown that the specific limitations determined by the ALJ were in error, and it was not error for the ALJ to refer to these limitations as "light work," particularly when the

ALJ relied on the VE's testimony that there are sedentary jobs that the plaintiff can perform. (Tr. 18-19.)

The plaintiff argues that he was prejudiced because the VE only identified jobs at the sedentary-exertion level but did not identify any at the light-exertion level. Docket Entry No. 14-1, at 12. Generally, a person who can perform medium or light level work can also perform sedentary work. *See* 20 C.F.R. § 404.1567(b)-(c). *See also Branon v. Comm'r of Soc. Sec*, 539 Fed. Appx. 675, 681 (6th Cir. Oct. 2, 2013). In this case, the ALJ asked the VE a hypothetical question, based on the plaintiff's own estimation of his limitations, that included lifting only fifteen pounds occasionally and frequently with an option to sit and stand at will, and the VE responded that such a person could perform sedentary work.[24] (Tr. 42-43.) It is notable, but does not constitute reversible error, that the plaintiff's RFC does not precisely match the hypothetical question that the ALJ posed to the VE because the limitations identified by the ALJ in this hypothetical question are more limiting than the plaintiff's RFC. *See Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 844-45 (6th Cir. June 23, 2005) (holding that it is not reversible error for an ALJ to pose a hypothetical question that differs from the plaintiff's RFC when the hypothetical question is more favorable to the plaintiff than the RFC). Even with these greater limitations, the VE testified that there were available jobs at the sedentary level. Because the plaintiff had an RFC that was greater than that required to perform sedentary work, the ALJ was permitted to rely on the VE's testimony regarding the availability of sedentary jobs.

---

[24] This was the third hypothetical question posed to the VE and the only one that resulted in testimony regarding representative occupations at step five. In response to the first two hypothetical questions, the VE testified that a person with those limitations could return to the plaintiff's past relevant work. (Tr. 40-41.)

The plaintiff also argues that, when determining his RFC, the ALJ should have considered his mental impairments, given controlling weight to the opinions of Drs. Leeper, Acosta, and Schlosser, and included a limitation for his alleged problems "grabbing objects due to limited movement in his right thumb." Docket Entry No. 14-1, at 14-16. These issues have already been addressed. Because the ALJ did not err in dealing with these issues, there is likewise no error in the determination of the plaintiff's RFC.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be DENIED and that the decision of the ALJ be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge